IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.:

**JOLLEY POTTER RANCHES ENERGY CO, LLC,**
**on behalf of themselves and all others similarly situated,**

Plaintiff,

v.

**TEP ROCKY MOUNTAIN LLC,**

Defendant.

---

## COMPLAINT

---

Plaintiff, by and through undersigned counsel, states and alleges the following:

### THE PARTIES, JURISDICTION, AND VENUE

1.   Plaintiff Jolley Potter Ranches Energy Co., LLC**,** owns mineral rights,

royalty interests, and/or overriding royalty interests in Garfield County, Colorado.

2.   Plaintiff, and the members of the Plaintiff Class, receive or have received monthly

royalty payments from Defendant TEP Rocky Mountain LLC, formerly known as WPX Energy

Rocky Mountain, LLC, formerly known as Williams Production RMT Company, LLC  formerly

known as Williams Production RMT Company (a single entity referred to herein as "TEP"),

related to hydrocarbons that TEP has produced in Garfield County and Rio Blanco Counties in

Colorado.

1

3.  Pursuant to C.R.C.P. 23, Plaintiff bring this action on behalf of themselves and all other persons similarly situated.  The class that Plaintiffs represent (the Plaintiff Class) is described as follows:

> The persons or entities who have received royalty or overriding royalty payments from sales of natural gas or natural gas liquids from TEP, in Garfield County or in Rio Blanco County, Colorado, during and after the production month of August, 2011; excluding from such Class: (1) TEP; (2) the United States insofar as its interests are managed by the Minerals Management Service; and (3) Indian Tribes and their allottees.

4.  Plaintiff is a resident of Mesa County, Colorado. Plaintiff is a Colorado limited liability company with its principal office in Garfield County, Colorado.

5.  TEP was a Delaware corporation while operating in the form of Williams Production RMT Company and thereafter was a Delaware limited liability company.  TEP is registered and is doing business in the State of Colorado, with its principal place of business located outside of Colorado.

6.  Williams Production RMT Company changed its form to a limited liability company and its name to Williams Production RMT Company LLC on October 12, 2010. On January 19, 2012, Williams Production RMT Company LLC changed its name to WPX Energy Rocky Mountain, LLC.  On April 22, 2016, WPX Energy Rocky Mountain, LLC changed its name to TEP Rocky Mountain LLC.

7.  Effective on or about October 1, 2015, ownership of WPX Energy Rocky Mountain, LLC was transferred from WPX Energy, Inc. to Terra Energy Partners, LLC.

8.  The Williams Companies were affiliated with Williams Production RMT

2

Company and with Williams Production RMT Company, LLC, and with WPX Energy Marketing, LLC, among other affiliates.

9.      TEP owned and/or operated the oil and gas leases and other instruments pursuant to which it has paid royalties to the Plaintiff Class ("Royalty Instruments").

10.     As lessee, operator and/or royalty payor TEP was responsible for marketing hydrocarbons produced from applicable oil and gas leases and other instruments and was responsible for calculating and paying royalties owed to Plaintiff and to members of the Plaintiff Class.

11.     TEP is and was liable for any breach of its obligation to market its produced gas and to pay its royalties prudently and in good faith, and in the manner required by Colorado law and by its oil and gas leases and other instruments, as more fully set forth below.

12.     This Court has jurisdiction over the parties and the subject matter of this case pursuant to 28 U.S.C. §1332 (the Class Action Fairness Act) and upon the date of filing based on the following:

a) the amount in controversy for the aggregated putative class members exceeds $5,000,000;

b) minimum diversity, as required by 28 U.S.C. §1332, exists between the members of the putative class and TEP; and

c) TEP is not a citizen of the State of Colorado.

3

## CLASS AND GENERAL ALLEGATIONS

13.     There are in excess of 1000 persons or entities in the Plaintiff Class defined above, and the Plaintiff Class is so numerous that joinder of all the members would be impracticable.  The exact size of the Plaintiff Class and the identity of its members are ascertainable from the business records of TEP.

14.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members of the Plaintiff Class.

15.      The claims asserted by Plaintiff are typical of the claims of the members of the Plaintiff Class.  The claims arise from the same course of conduct by TEP, and the relief sought is common.

16.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Plaintiff Class.  Plaintiff has retained counsel competent and experienced in representing royalty owners such as Plaintiff in class action litigation against producers with respect to the sufficiency of royalty payments.

17.     A class action is superior to other methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, because the economic damages suffered by the individual members of the Plaintiff Class may be relatively modest compared to the expense and burden of individual litigation, it would be impracticable for members of the Plaintiff Class to seek redress individually for the wrongful conduct alleged herein. There will be no undue difficulty in the management of the litigation as a class action.

4

18.     When paying royalties to the class members, TEP utilized the same "value" per unit of volume (mmbtu or gallon) for each payment period to calculate the royalties which it paid to all class members from products (including residue gas and natural gas liquids) which it produced in both Garfield and Rio Blanco County. This "value" was the "Weighted Average Sales Price" (WASP) which resulted from TEP's marketing during each applicable payment period. When paying royalties to the class members, TEP also deducted from all class members the same amount of costs per unit of volume during each payment period. TEP has pooled production, revenue, expenses in its royalty calculations and thereby treated its royalty owners in a uniform and common manner with respect to the factual matters asserted in this complaint.

19.     On September 20, 2006, Ivo, Sidney and Ruth Lindauer, and Diamond Minerals, LLC, as class representatives filed suit against Williams Production RMT Company in the District Court of Garfield County, Colorado, Case Number 2006CV317, in which they alleged that Williams Production RMT Company was violating Colorado law by taking deductions for expenses that it was incurring to place gas in marketable condition and otherwise failing to properly calculate royalties on natural gas and natural gas liquids. The state court thereafter certified a class of royalty owners comprised of the persons and entities in Garfield County described in the certification order. On March 20, 2009, the state court approved a partial Settlement Agreement covering that class. This lawsuit only raises claims that were not addressed in the Settlement Agreement, or specifically allowed by the Settlement Agreement, and have arisen from payments made since the period covered by the Settlement Agreement.

20.    This lawsuit asserts that since August of 2011, TEP has breached the express and/or implied terms of its Royalty Instruments by:

i)       failing to comply with the enhancement test when taking deductions from the proceeds of processing the second marketable product (NGLs);

ii)      taking unreasonable deductions based on affiliate charges;

iii)     taking unreasonable and imprudent deductions of transportation charges;

iv)     failing to prudently market the second marketable product (NGLs);

v)      failing to obtain the best reasonably available terms when marketing NGLs;

vi)     failing to prudently market residue gas;

vii)    failing to obtain the best reasonably available terms when marketing residue gas;

viii)   breaching the terms of its market value Royalty Instruments; and

ix)     otherwise violating the express and implied terms of its Royalty Instruments.


21.   There is no language in the Royalty Instruments that abrogates the implied covenant to market residue gas or subsequent fractionated natural gas liquids, or that relieves TEP from its obligation to pay royalties based on the highest reasonably available value and terms for its residue gas and natural gas liquids, or relieves TEP of its obligation to operate reasonably and prudently and to protect the interests of its royalty owners.

22.    None of the Royalty Instruments include language which limit the claims set out in this case.

23.    In December of 2011, the Williams Companies spun off TEP to its shareholders.

6

24.    Before doing so, however, Williams Companies caused TEP to enter into one or more contracts with then affiliated Williams entities, including without limitation Williams Field Services Company, LLC, Williams Energy Marketing, LLC, Northwest Pipeline, and Williams Energy Resources, LLC, for the gathering, processing, transportation and other services at inflated costs, as more fully set forth below.

25.    Each claim for relief set out herein incorporates and includes all paragraphs of this Complaint to the extent necessary or convenient to state the claim asserted therein on behalf of the Plaintiff Class.

## CLAIMS FOR RELIEF BASED ON TEP'S TAKING IMPROPER DEDUCTIONS WHEN CALCULATING ROYALTIES

### FIRST CLAIM FOR RELIEF
**(TEP improperly took deductions despite failing to enhance the total royalties received when TEP was creating a second marketable product (NGLs).**

26.    In order to deduct costs incurred to create a second marketable product from royalty payments, TEP, as the lessee and royalty payor, has the burden to prove that such costs were reasonable and that the actual royalty revenues increased proportionately to the costs assessed against royalties (referred to herein as the "enhancement test"). *Lindauer v. Williams Production RMT Company*, 381 P.3d 378, 382-384 (Colo. App. 2016).

27.    From the December 2014 production month through the October 2015 production month, and for other periods, TEP's deductions incurred to create a second marketable product, identified on its royalty check statements as natural gas liquids ("NGLs"), resulted in royalty

payment amounts which were substantially below the royalty payment amounts that would have resulted from marketing the same mmbtus as residue natural gas.

28.     By taking these deductions incurred to create a second marketable product (NGLs), TEP breached its duty to market gas and to pay royalty to the Class Members in the manner required by the "enhancement test" in at least 19 out of 26 production months between December 2014 production month and January 2017 production month.

29.     TEP has used "accounting for comparison" method to calculate its federal royalties. Using this method, TEP has compared the value of its processed gas (residue gas value plus the net value of the subsequent fractionated natural gas liquids after processing) to the value its residue gas would have had in the absence of processing, and TEP paid the federal government, as royalty, the higher of these two amounts. *Abraham v. WPX*, 317 FRD 169, Finding 285 (D. N.M. 2016).

30.     As a result of utilizing the "accounting for comparison" method and engaging in its other marketing and accounting operations and calculations, TEP was aware, or should have been aware, during its royalty accounting of whether or not the creation of the second marketable product (NGLs) enhanced royalty revenue.

31.     When TEP cannot prove that residue gas royalty revenue was enhanced by incurring costs to create a second marketable product in the form of NGLs, TEP was not entitled to deduct the cost of creating the second marketable product from royalty revenues.

32.     When TEP royalty revenue per mmbtu for residue gas exceeded the royalty revenue per mmbtu for the second marketable product (NGLs), TEP did not meet the

8

enhancement test and it was not entitled to deduct from royalty payments the costs incurred to create a second marketable product.

33.     This result is required regardless of whether TEP processed such gas to condition the gas for market, or to satisfy its predominately non-arms-length contracts to process such gas, or for other reasons.

34.     As a result of such wrongful deductions, Plaintiff and members of the Plaintiff Class have sustained substantial damages resulting from TEP's breaches of the lease terms and its royalty payment obligations in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (TEP took unreasonable deductions based on affiliate charges.)

35.     In Colorado, the implied covenant to market requires that all costs deducted from royalty must be reasonable.  Imprudent, unnecessary, or excessive costs are not reasonable.

36.     In January 2012, The Williams Companies, Inc. spun off WPX Energy, Inc. together with its affiliate WPX (including its Piceance Basin leasehold and production operations), to shareholders of The Williams Companies, Inc. without payment of consideration to The Williams Companies by such shareholders.

37.     Prior to the WPX Energy, Inc. spinoff, The Williams Companies acted to protect its own interest by causing to be put in place non-arms-length, affiliate agreements between WPX Energy, Inc., WPX Energy Marketing, Inc., Williams Production RMT Company LLC (now TEP) and their Williams Companies affiliates.

38.    Such transactions between The Williams Companies affiliates and TEP are non-arms length, affiliate transactions. These agreements retained their legal character as non-arms length transaction even after the WPX Energy, Inc. spinoff was completed. *Abraham v. WPX*, 317 FRD 169, at Finding 184 (D. N.M. 2016).

39.    Upon information and belief, in these affiliate agreements, TEP often dedicated TEP's Piceance Basin production to the non-arms-length agreement for the life of TEP leases, or for other long periods.

40.    Upon information and belief, these affiliate agreements state that The Williams Companies will provide gathering, processing, compression, dehydration, treatment and firm transportation, and other services at rates favorable to The Williams Companies and, upon information and belief, at increased rates substantially above the actual cost to The Williams Company affiliates of providing such services, and/or above rates negotiated in arms-length transactions for the same or similar services with other non-affiliated parties.

41.    Upon information and belief, these non-arms-length, affiliate agreements provide substantial excessive and often commercially unreasonable advantages to The Williams Companies, and unreasonably disadvantage TEP and/or its royalty owners. *See e.g. Fact Findings 181 to 186 in Abraham v. WPX*, 317 FRD 169 (D NM 2016).

42.    Upon information and belief, the costs associated with deductions related to such affiliate transactions were not actually incurred by its affiliates in order to provide the service for which the deduction was purportedly incurred.

10

43.     The implied covenant to market requires that affiliate costs deducted from royalty be no greater than the actual costs incurred by the affiliate to provide the gathering, processing, compression, dehydration, firm transportation or other services.

44.     The WPX Energy, Inc. Information Statement related to the WPX Energy, Inc. spinoff states, in part, that WPX (now TEP) "gathering, processing and transportation expenses" increased in 2011 by $156 million "primarily as a result of fees paid to Williams Partners…for gathering and processing assets in the Piceance Basin that [WPX] sold to Williams Partners in the fourth quarter of 2010 and an increase in natural gas liquids volumes processed at Williams Partners' Willow Creek plant."  WPX gathering and processing costs were $0.32/Mcfe higher in the first 9 months of 2011due to "fees paid to Williams Partners pursuant to the gathering and processing agreement associated with the assets [WPX] sold to Williams Partners in the fourth quarter 2010."  WPX operating costs for the assets sold, for the same period in 2010, were $58 million or $0.19/Mcfe vs. 2011 "fees" of $156 million or $0.32/Mcfe.

45.     One result of these increases in affiliate charges was an increase in the amount of costs TEP deducted from royalty paid to the members of the class, without an equivalent increase in the actual cost incurred to provide transportation or processing, or other services.

46.     TEP's affiliate transactions regarding gathering, processing, transportation and other services also have had quite different financial impacts on TEP, TEP's affiliates, and TEP's royalty owners. As a result, the interests of lessor and lessee are in direct conflict, strict judicial scrutiny is required, and TEP failed to operate the lease prudently for the mutual benefit of both lessor and lessee.

11

47.    During the period of preparation for the WPX Energy, Inc. spin off, upon information and belief, TEP entered into or extended its firm transportation reservation agreements with The Williams Company affiliated pipelines companies, including Northwest Pipeline GP, on terms favorable to Northwest Pipeline and unfavorable to TEP and /or its royalty owners.

48.    The non-arms length renegotiations between Northwest Pipeline and WPX (now TEP)  resulted in substantially higher firm transportation charges to TEP, which upon information and belief exceeded the cost to the affiliate, Northwest Pipeline, of providing such transportation services, and were on less favorable terms for WPX/TEP and its royalty owners than discounted or negotiated firm transportation and interruptible service provided to third parties for the same or similar services by Northwest Pipeline during the same time period. Such renegotiated costs were excessive, unreasonable and disadvantageous to TEP and its royalty owners, and upon information and belief, were not related to an equivalent increase in the actual cost incurred to provide such transportation service by Northwest Pipeline.

49.    After the spin off, WPX Energy, Inc.'s then independent management aggressively focused on reduction of WPX's firm transportation and storage obligations. WPX Energy, Inc. reduced such obligations by more than 90%, from $1.6 billion in 2013 down to approximately $177M by mid-2016; according to WPX Energy, Inc.'s 2015 Year-end Results and WPX 5/25/2016 Press Release.

50.    Based upon information and belief, the terms of such agreements between affiliated entities included commercially unreasonable provisions, which exceed the actual cost

to the affiliate of performing the required services, are unreasonable, are excessive, and are disadvantageous to TEP and its royalty owners when compared to other reasonably available opportunities for TEP or a prudent operator to obtain the same or similar services.

51.     Upon information and belief, a primary purpose of The Williams Companies' affiliate agreements was to insure long term feed stocks and economic viability for The Williams Companies' gas processing plants.

52.     Based on information and belief, these affiliate agreements were executed during or anticipating a market period which was known to The Williams Companies, WPX Energy, Inc. and TEP to likely be a difficult operating environment for Piceance Basin processing plants, gathering facilities and gas pipelines owned by the Williams Companies.

53.     Such non-arms-length affiliate service, firm transportation, and other agreements are generally not available to the public, and are generally treated as confidential, proprietary information by The Williams Companies, by WPX Energy, Inc., by TEP and by their affiliates.

54.     Such agreements were not disclosed to the TEP royalty owners in the ordinary course of business by TEP, and TEP royalty owners have no ready means of determining their existence or content.

55.     Based upon information and belief, TEP's non-arms-length agreements and related charges to its royalty owners have breached the implied covenant to market together with TEP's duty to diligently and prudently operate the leasehold and its duty to diligently protect the interests of its lessors.

56.      These breaches of duty have resulted from TEP's deduction of costs in excess of the actual costs incurred by its affiliate to provide the applicable service from royalties paid to all Plaintiff Class Members. Such costs are unreasonable and excessive whenever and wherever deducted by TEP, both with respect to those leases which authorize such deductions and those whose leases which do not authorize such deductions.

57.      As a result of the conduct of TEP, the Plaintiff and Plaintiff Class have sustained substantial damages resulting from lessee's breaches of the lease terms and its royalty payment obligations in an amount to be proved at trial.

## THIRD CLAIM FOR RELIEF
### (TEP took unreasonable deductions for residue gas firm transportation charges)

58.      The implied covenant to market requires that all costs deducted from royalty must be actually incurred by TEP, and must be reasonable, prudent, necessary and not excessive.

59.      Prior to 2009, the volume of gas produced and marketed in the Piceance Basin often seasonally neared or exceeded "take-way" and gas processing capacity available for residue gas produced in the Basin, resulting in capacity restrictions in the Piceance Basin.

60.      The Piceance Basin gas market has low in-Basin demand for natural gas and there is only a de minimus market for the produced residue gas in the Basin. *Savage v. Williams Production RMT Co.*, 140 P.3d 67, 71 (Colo. App. 2005).

61.      Prior to 2009, these realities of the marketplace often resulted in a substantial negative "basin differential" in Piceance Basin gas prices vs. prices available in other downstream markets.

62.     Large Piceance Basin producers, such as Williams and EnCana, often responded to these pre-2009 marketplace realities by making large and speculative capital investments to reserve future long-term firm transportation capacity on pipelines which transport natural gas away from the Piceance Basin, and which resulted in substantial cost for /TEP and substantial cost deductions from its royalty payments.

63.     Between 2005 and 2008, net export capacity of interstate pipeline out of Western Colorado nearly tripled while gas gathering, treatment and processing capacity also increased dramatically.

64.     Since 2009, fewer wells have been drilled and less gas has been produced in the Piceance Basin; this fact, together with capacity increases referenced above, has resulted in reduction of the percentage of Piceance Basin processing and pipeline takeaway capacity utilized.

65.     In 2009, the Piceance Basin Gas Market underwent a dramatic transition, which was known to major Piceance Basin producers, including The Williams Companies, WPX Energy, Inc., and TEP who had access to the required confidential information, together with the staff expertise to evaluate the data.

66.     The Williams Gas Marketing Strategic Plans for 2009 and 2010 state that, due to pipeline capacity expansion out of the Piceance Basin, infrastructure constraints "are not expected to be a real issue again until 2015 or later."

67.     This 2009 transition was not then understood or appreciated by the general public, including TEP royalty owners.

15

68.     In about 2014, information regarding the Piceance Basin gas market transition

began to be published, *see e.g.* John Harpole, "*From the Piceance Basin to the Pacific Rim,*"

presented to the Grand Junction Economic Partnership (October, 2014) and amended and re-

published (April, 2017) (obtained by Plaintiffs' Counsel July, 2017) ( "Harpole").

69.     Since 2009, the "mid-stream processing and interstate pipeline capacity" in the

Piceance Basin have been significantly "over-built;" this "under-utilized capacity" allows

"Piceance Basin Producers unrestricted access to markets from the West Coast to Midwestern

and Mid-Atlantic States" at the lowest "basin differentials" in the country. (Harpole).

70.     In 2009, the Piceance Basin transitioned from i) a gas market constrained by

inadequate take-away capacity, where "producers were at the mercy of the parties [like The

Williams Companies and TEP] who held pipeline [firm] transportation capacity contracts,"

(Harpole  at 30),  ii) to a gas market with significantly over-built processing and pipeline

capacity, in which firm transportation reservations are unnecessary.

71.     In the same period, as described below, the White River Hub located in the

Piceance Basin has developed into a significant market hub at which natural gas is sold in

significant volumes at a published index price, and, if transportation is required, gas can be

transported by prudent operators downstream at the much lower discounted, negotiated and/or

interruptible rates.

72.     As a result of these changes in market conditions, prudent operators in the

Piceance Basin, and gas purchasers at the White River Hub, had the opportunity to avoid

excessive, unreasonable, and unnecessary firm transportation charges, and the opportunity to pay significantly lower fees to process and transport their gas.

73.     The Williams Gas Marketing Strategy Plan for 2010 emphasized its new "proactive approach" to "eliminate … transportation obligations [related to firm transportation service] and/or negotiate better rates … due to the drilling slow down."

74 .     As described above, post-spinoff WPX Energy, Inc. and TEP management recognized its firm transportation obligations as a massive liability, and engaged in an aggressive program to divest itself of these obligations as quickly as possible.

75.     Before and after the WPX Energy, Inc. spinoff, upon information and belief, TEP's marketing unit recognized the unfair terms in the non-arms length, affiliate agreements imposed on it by the Williams Companies. For example, the TEP marketing unit refused to accept an onerous keep-whole processing agreement imposed on WPX and/or TEP by the Williams Companies in the San Juan Basin. *Abraham v. WPX*, 317 FRD 169, Findings 185-186 (D. N.M. 2016).

76.     After the 2009 transition in market conditions, WPX/TEP firm transportation charges to its royalty owners have been unreasonable and excessive, because prudent operators in the Piceance Basin can market their gas without incurring such costs, and/or by incurring much lower costs for the same or similar transportation services.

77.     At least since August 2009, the White River Hub has provided TEP the opportunity to market its Piceance Basin produced residue gas at its prevailing market price (or fair market value) without incurring firm transportation costs.

17

78.      Since 2009, TEP deduction of firm transportation charges from all class member

royalty payments has been commercially unreasonable.

79.      As the result of such conduct by TEP, the Plaintiff and Plaintiff Class have

sustained substantial damages resulting from their breaches of the lease terms and royalty

payment obligations to the Plaintiff and Plaintiff Class in an amount to be proved at trial.

**CLAIMS FOR RELIEF BASED ON TEP's IMPROPER DETERMINATION OF
VALUE USED TO CALCULATE ROYALTIES**

**FOURTH CLAIM FOR RELIEF**
**(TEP breached its duty to diligently and prudently market the second marketable
product (NGLs).**

80.      In Colorado, TEP, as the lessee, and royalty payor, is required to reasonably,

diligently and prudently operate each Royalty Instrument and to diligently and prudently market

the hydrocarbons produced therefrom, including the second marketable product (NGLs), in order

to obtain the mutual benefit of lease operations and marketing activities for both the lessor (as

used herein the term lessor shall included overriding royalty owners) and lessee, and to act at all

times in the best interests of both the lessor and lessee.

81. The prudent operator standard is objective rather than subjective. TEP cannot justify

its actions or omissions on grounds personal to it or its operations, or by reference to TEP's own

peculiar contract, or business obligations, or marketing strategy.

82.      The same TEP marketing decision regarding whether to market mmbtus as NGLs

rather than residue gas, has had quite different financial impacts on TEP, TEP's affiliates, and

TEP's royalty owners. Each such marketing decision often result in direct conflicts between the

18

interests of TEP and its affiliates and the interests of its lessors and royalty owners. Because such marketing decisions are not made for the mutual benefit of both lessor and lessee, strict judicial scrutiny is required.

83.     Often TEP marketed the second marketable product (NGLs) in a manner which resulted in less net revenue for both TEP and its royalty owners than would have resulted from marketing the same mmbtus as residue gas. The same marketing decision increased the revenue of TEP's' affiliates, or was entered into for other business reasons of TEP which did not benefit its royalty owners.

84.     With respect to each such marketing and/or operational decision, the interests of TEP and its royalty owners were in direct conflict; because the same decision harmed the royalty owners and benefitted TEP and/or its affiliates.

85.     TEP's marketing and operational decisions during the period failed to reasonably, diligently and prudently protect the interests of its royalty owners, and failed to obtain the fundamental purpose of their oil and gas leases -- to obtain the mutual benefit of lessee's operations for both parties, with due regard for the interests of both lessor and TEP.

86.     The implied covenant to market requires TEP to determine whether creating a second marketable product (NGLs) would obtain a higher value for its royalty owners than would marketing the same mmbtus as residue gas.

87.     As a result of utilizing the "accounting for comparison" method, described above, and engaging in its other marketing and accounting operations and calculations, TEP was aware, or should have been aware, during its monthly royalty accounting and its ongoing operations, of

19

whether the value of its marketed residue gas exceeded the value of its processed gas, and of its duty to pay its royalty owners the higher of the two amounts.

88.     TEP had the reasonably available opportunity to market a significant portion, or all, of the mmbtus TEP elected utilize to create a second marketable product (NGLs) as either: a) residue natural gas or b) component NGLs.

89.     Often marketing mmbtus as residue natural gas (rather than as a second marketable product (NGLs)) was the marketing opportunity available to TEP which would have obtained for TEP's royalty owners the most favorable terms -- for those mmbtus that it had the option to market as either residue natural gas or as a second marketable product (NGLs).

90.     Often electing to create a second marketable product (NGLs) required TEP to incur substantial additional costs, and/or obtain a different (sometimes lower) price per mmbtu, which resulted in a lower royalty payment than was available from simply marketing the same mmbtus as residue gas.

91.     TEP breached its duty to prudently pay royalty to the Plaintiff and Plaintiff Class when TEP marketed the second marketable product (NGLs) for less than the proceeds TEP could have obtained from simply selling the same mmbtus as residue gas during at least 19 of 26 months between the December 2014 production month and the January 2017 production month, and during other periods.

92. For any time period, to the extent TEP's marketing of the second marketable product (NGLs) would obtain less favorable terms for its royalty owners than the marketing the same mmbtus as residue gas, marketing such mmbtus as the second marketable product failed to

obtain the mutual benefit of lease operations for the lessor and lessee, failed to diligently protect the interests of the lessor, was unreasonable and was imprudent.

93.     As the result of such breaches, the Plaintiff and Plaintiff Class have sustained substantial damages resulting from TEP breach of the lease terms and its royalty payment obligations in an amount to be proved at trial.

## FIFTH  CLAIM FOR RELIEF
**(TEP failed to pay royalties based on the best reasonably available terms for the mmbtus sold as a second marketable product (NGLs) rather than a reside gas.)**

94.     The implied covenant to market requires TEP, as the lessee and royalty payor, to market natural gas liquids in that manner which will achieve for the royalty owner the best reasonably obtainable terms, or, in the event TEP elects to market a second marketable product (NGLs) in a manner which is less advantageous to its royalty owners, to pay royalty owners based on the best terms reasonably obtainable for its royalty owners.

95.     The "best terms reasonably obtainable" standard is objective, rather than subjective. TEP cannot justify its actions or omissions on grounds personal to it or its operations, or by reference to TEP's own peculiar contract, or business obligations, or marketing strategy.

96.     The implied covenant to market requires TEP to determine whether the ethane, propane, butane, pentane and other subsequent fractionated natural gas liquids would obtain a higher value for its royalty owners if it is marketed either: a) as a part of the residue gas stream, or b) as separate component products (after natural gas liquids processing).

97.     For any time period, to the extent TEP's marketing of the applicable mmbtus  as part of the residue gas stream would obtain better terms for its royalty owners, TEP has the duty

21

to either market the mmbtus as components of the residue gas stream, or to pay royalty as if it had done so, in order to pay royalty on the best terms reasonably available for its royalty owners.

98.    As a result of utilizing the "accounting for comparison" method, described above, and engaging in its other marketing and accounting operations and calculations, TEP was aware, or should have been aware, during its monthly royalty accounting and its ongoing operations, of whether the value of its marketed residue gas exceeded the value of its processed gas, and of its duty to pay its royalty owners the higher of the two amounts.

99.    TEP had the reasonably available opportunity to market a significant portion, or all, of the mmbtus TEP elected to process into subsequent fractionated natural gas liquids as either: a) residue natural gas or b) component NGLs.

100.    Often marketing mmbtus as residue natural gas (rather than as subsequent fractionated natural gas liquids) was the marketing opportunity available to TEP which would have obtained for TEP's royalty owners the best reasonably available marketing terms -- for those mmbtus that it had the option to market as either residue natural gas or as a second marketable product (NGLs).

101.    Often electing to create a second marketable product (NGLs) required TEP to incur substantial additional costs, and/or obtain a different (sometimes lower) price per mmbtu, which resulted in a lower royalty payment than was available from simply marketing the same mmbtus as residue gas.

102.    When TEP voluntarily elected not to market a substantial portion of its produced mmbtus as residue natural gas, but rather elected to create a second marketable product (NGLs),

22

TEP did not pay royalty based on the reasonably available higher value of the mmbtus marketed as residue natural gas, but rather paid royalty based on the lower value of the same mmbtus marketed as the second marketable product (NGLs) and thereby breached its duty to pay royalties based on the best reasonably available terms.

103.     TEP breached its duty to pay royalty to the Plaintiff and Plaintiff Class in a manner which would obtain the best reasonably available terms for its royalty owners for at least 19 of 26 months between the December 2014 production month and the January 2017 production month, and during other periods.

104.     As the result of such breaches, the Plaintiff and Plaintiff Class have sustained substantial damages resulting from TEP breach of the lease terms and its royalty payment obligations in an amount to be proved at trial.

**SIXTH CLAIM FOR RELIEF**
**(TEP breached its duty to prudently market residue gas).**

105.     In Colorado, TEP, as the lessee and royalty payor, is required to reasonably, diligently and prudently operate each Royalty Instrument and to diligently and prudently market the hydrocarbons produced therefrom, including residue gas, in order to obtain the mutual benefit of lease operations and marketing activities for both the lessor (as used herein the term lessor shall included overriding royalty owners) and lessee, and to act at all times in the best interests of both the lessor and lessee.

106.     Because TEP's marketing decisions, together with certain of its operational decisions, have had a different impact on the interests of the lessor and lessee (i.e. TEP's

marketing did not result in the same mutual benefit for the lessor and lessee, and/or resulted in a

disproportionately larger benefit for TEP), the court is required to strictly scrutinize the TEP's

conduct to determine whether TEP acted in a diligent and prudent manner to protect the interests

of its royalty owners.

107.    The prudent operator standard is objective rather than subjective. TEP cannot

justify its actions or omissions on grounds personal to it or its operations, or by reference to

TEP's own peculiar contract, or business obligations, or marketing strategy.

108.    Upon information and belief, TEP's marketing methods, and certain of its

operational decisions (including affiliate transactions) have increased net revenue attributable to

TEP and/or its affiliates, and have failed to determine or consider the effect of TEP's marketing

transactions on royalty revenue payable to Plaintiff and Plaintiff Class.

109.    TEP's marketing decisions regarding whether to a) sell residue gas for the

prevailing market price without incurring transportation costs at the White River Hub or b) sell

residue gas for a downstream price after incurring transportation costs, have had quite different

financial impacts on TEP, TEP's affiliates, and TEP's royalty owners.

110.    Often TEP marketed produced residue gas downstream of White River Hub and

thereby reduced the net royalty revenue paid to its royalty owners, while the same marketing

decision increased TEP's net revenue and/or the revenue of TEP's' affiliates, or was entered into

for other business reasons of TEP which did not benefit its royalty owners.

111.    With respect to such marketing decisions and operational decisions, the interests of TEP and its royalty owners were in direct conflict; because the same decision harmed the royalty owners and benefitted TEP and/or its affiliates.

112.    TEP's marketing and operational decisions during the period failed to reasonably, diligently and prudently protect the interests of its royalty owners, and failed to obtain the fundamental purpose of their oil and gas leases -- to obtain the mutual benefit of lessee's operations for both parties, with due regard for the interests of both lessor and TEP.

113.    Upon information and belief, since August, 2011, TEP often had other marketing opportunities on terms which were more favorable to its royalty owners than were the actual marketing transactions TEP entered into.

114.    In a case brought against WPX, the Court found that "[w]ithin the oil-and gas industry, it is generally believed that the index price reflects the market value of residue gas delivered at the designated location in the month of publication." *Abraham v. WPX*, 317 FRD 169, at Finding 305 (D. NM 2016) (citing Field Depo. at 39:1-13).

115.    In its 12/7/2011 Information Statement regarding the WPX Energy, Inc. spinoff from The Williams Companies, WPX Energy, Inc. and WPX/TEP admit the "White River Hub (Greasewood-Meeker, Colorado) is the major market hub exiting the Piceance Basin."

116.    During the period, S&P Global Platts has published an index of daily and monthly natural gas prices derived from sales at the White River Hub located in the Piceance Basin in Rio Blanco County, Colorado (the "White River Hub Index Price").

117.    The White River Hub Index Price, as computed by Platts, is the weighted average price of natural gas sold in the transactions at the White River Hub which are reported to Platts by the parties to the marketing transactions.  The White River Hub Index Price is Platts' published computation of the weighted average daily and monthly prices for natural gas of pipeline quality and pressure marketed at the White River Hub market.

118.    Since at least August, 2011, the White River Hub was the first commercial market for residue natural gas produced in Garfield and Rio Blanco Counties, Colorado.

119.    White River Hub Index Price is, and has generally been understood to be, the "prevailing market price" in the Piceance Basin and understood to establish the "market value" of natural gas produced in Garfield and Rio Blanco Counties, Colorado.

120.    Under Colorado law, TEP is precluded from deducting costs incurred prior to delivering its produced gas to the first commercial market for such residue gas and from deducting costs incurred by TEP to place the produced gas in a condition acceptable to that first commercial market.

121.    The fact that TEP has deducted transportation costs downstream from the White River Hub is an admission by TEP that the White River Hub is the first commercial market for WPX residue gas produced from the Piceance Basin in Garfield and Rio Blanco Counties, Colorado.

122.    For each month during the period, TEP had the reasonably available opportunity to market its residue natural gas produced from the Piceance Basin in Garfield and Rio Blanco Counties, Colorado at the White River Hub.

26

123.    When TEP has marketed gas at or near the White River Hub during the period, WPX/TEP has typically incurred, at most, a demand charge of $0.012/mmbtu, and FERC's $0.0014/mmbtu "Annual Charge Adjustment" (ACA), and no fuel charges.

124.    For each month during the period, TEP had the opportunity to obtain such prevailing market price (or "market value") for its produced gas at or near the White River Hub without incurring transportation costs in excess of the nominal fees charged by the White River Hub itself.

125.    With respect to numerous TEP marketing transactions  since August, 2011, TEP often elected not to market its produced gas for its prevailing market price with little or no cost deductions, but rather elected to enter into marketing transactions in which TEP consistently incurred higher, unnecessary Transportation Costs and often marketed the produced residue gas for less than its prevailing market price (or fair market value).

126.    From the September, 2011 production month through the November, 2014 production month, and during other periods, TEP marketing transactions, as reported on its royalty check statements, resulted in royalty payment amounts which were substantially below the royalty payment amounts which would have resulted from the opportunity to market TEP produced gas at the White River Hub, at its prevailing market price less the nominal White River Hub fees.

127.    To the extent that TEP by-passed this available prevailing market price, which could be obtained without incurring any transportation costs in excess of the nominal White River Hub fees, in order to market the same residue gas for a lower net price and/or at greater,

unnecessary transportation expense, TEP has failed to obtain the mutual benefit of lease

operations for both lessor and lessee, and to reasonably, diligently and prudently operate the

lease or market residue gas, and has failed protect the interests of its royalty owners.

128.    Such conduct is a breach of TEP's duty to market produced residue gas for the

mutual benefit of both the lessor and lessee, as a reasonable and prudent operator.

129.    As a result of TEP's conduct, the Plaintiff and Plaintiff Class have sustained

substantial damages resulting from TEP breaches lease terms and its royalty payment obligations

in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
**(TEP failed to pay royalties based on the best reasonably available terms for mmbtus
marketed downstream of the White River Hub.)**

130.    The implied covenant to market is implied in every oil and gas lease in Colorado,

including both "market value" and "proceeds" leases. *Garman v. Conoco, Inc.*, 886 P.2d 652,

654 (Colo. 1994).

131.    It is well established that one prong of the implied covenant to market requires

TEP to market natural gas in that manner which will achieve for the royalty owner the best

reasonably obtainable terms, or, if the TEP voluntarily elects to market its gas in a manner which

is less advantageous to its royalty owners, to pay royalty owner based on the best terms

reasonably obtainable for its royalty owners.

132.    TEP has the duty to obtain the "best reasonably available terms" for its royalty

owners which requires TEP to obtain the most favorable of the terms reasonably available to it

under the then existing market conditions; it does not impose on TEP a duty to obtain the single

highest price for all its gas, in a vacuum.

133.    To the extent TEP marketed its gas for a less favorable price and terms than could

be obtained for its royalty owners by sale at the White Rive Hub for the prevailing market price

in the Piceance Basin and paid royalty thereon, TEP has paid its royalty owners royalties which

were based on less than the best reasonably obtainable price and terms available to TEP.

134.    Upon information and belief, since August, 2011, TEP often had other reasonably

available marketing opportunities on terms which were more favorable to its royalty owners than

were the actual marketing transactions TEP entered into.

135.    In a case brought against WPX, the Court found that "[w]ithin the oil-and gas

industry, it is generally believed that the index price reflects the market value of residue gas

delivered at the designated location in the month of publication." *Abraham v. WPX*, 317 FRD

169, at Finding 305 (D. NM 2016) (citing Field Depo. at 39:1-13).

136.    In its 12/7/2011 Information Statement regarding the WPX Energy, Inc. spinoff

from The Williams Companies, WPX Energy, Inc. and WPX/TEP admit the "White River Hub

(Greasewood-Meeker, Colorado) is the major market hub exiting the Piceance Basin."

137.    During the period, S&P Global Platts has published an index of daily and monthly

natural gas prices derived from sales at the White River Hub located in the Piceance Basin in Rio

Blanco County, Colorado (the "White River Hub Index Price").

138.    The White River Hub Index Price, as computed by Platts, is the weighted average

price of natural gas sold in the transactions at the White River Hub which are reported to Platts

by the parties to the marketing transactions.  The White River Hub Index Price is Platts' published computation of the weighted average daily and monthly prices for natural gas of pipeline quality and pressure marketed at the White River Hub market.

139.    Since at least August, 2011, the White River Hub was the first commercial market for residue natural gas produced in Garfield and Rio Blanco Counties, Colorado.

140.    White River Hub Index Price is, and has generally been understood to be, the "prevailing market price" in the Piceance Basin and understood to establish the "market value" of natural gas produced in Garfield and Rio Blanco Counties, Colorado.

141.    Under Colorado law, TEP is precluded from deducting costs incurred prior to delivering its produced gas to the first commercial market for such residue gas and from deducting costs incurred by TEP to place the produced gas in a condition acceptable to that first commercial market.

142.    The fact that TEP has deducted transportation costs downstream from the White River Hub is an admission by TEP that the White River Hub is the first commercial market for WPX residue gas produced from the Piceance Basin in Garfield and Rio Blanco Counties, Colorado.

143.    For each month during the period, TEP had the reasonably available opportunity to market its residue natural gas produced from the Piceance Basin in Garfield and Rio Blanco Counties, Colorado at the White River Hub.

144.    When TEP has marketed gas at or near the White River Hub during the period, WPX/TEP has typically incurred, at most, a demand charge of $0.012/mmbtu, and FERC's $0.0014/mmbtu "Annual Charge Adjustment" (ACA), and no fuel charges.

145.    For each month during the period, TEP had the opportunity to obtain such prevailing market price (or "market value") for its produced gas at or near the White River Hub without incurring transportation costs in excess of the nominal fees charged by the White River Hub itself.

146.    With respect to numerous TEP marketing transactions since August, 2011, TEP often elected not to market its produced gas for its prevailing market price with little or no cost deductions, but rather elected to enter into marketing transactions in which TEP consistently incurred higher, unnecessary Transportation Costs and often marketed the produced residue gas for less than its prevailing market price (or fair market value).

147.    From the September, 2011 production month through the November, 2014 production month, and during other periods, TEP marketing transactions, as reported on its royalty check statements, resulted in royalty payment amounts which were substantially below the royalty payment amounts which would have resulted from the reasonable, and available opportunity to market TEP produced gas at the White River Hub, at its prevailing market price less the nominal White River Hub fees.

148.    The "best reasonably obtainable terms" standard is objective, rather than subjective. TEP cannot justify its actions or omissions on grounds personal to it or its operations, or by reference to TEP's own peculiar contract, or business obligations, or marketing strategy.

149.    Such conduct is a breach of TEP's duty to obtain the best available terms for its royalty owner from the marketing of residue gas.

150.    As a result of TEP's conduct, the Plaintiff and Plaintiff Class have sustained substantial damages resulting from TEP breaches lease terms and its royalty payment obligations in an amount to be proved at trial.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that:

1.  This Court enter appropriate orders certifying the above-described Plaintiff Class;

2.  This Court hold that Defendant TEP is liable for underpayment of royalties in the manner alleged above;

3. This Court order TEP to provide corrected royalty payment accountings under the supervision of the Court;

4. This Court enter judgment against TEP for an award of damages to Plaintiff and Plaintiff Class in the underpayment amounts proven at trial and/or revealed by such accountings, together with costs and interest at the highest rate provided by law, moratory or otherwise;

5.    This Court award the Representative Plaintiff and Plaintiff Class an amount equal to their reasonable attorney fees together with their incurred costs and their litigation expenses.

6. This Court award the Representative Plaintiff and Plaintiff Class such other and further relief as the Court may deem just and proper.

Respectfully submitted this 20th day of February, 2019.

DUFFORD, WALDECK, MILBURN & KROHN, LLP

By:  /s/ Nathan A. Keever
    Nathan A. Keever, #24630
    744 Horizon Court, Suite 300
    Grand Junction, CO 81506
    (970) 241-5500
    dwmk@dwmk.com
    Attorney for Plaintiff

G.R. Miller, P.C.
    G.R. Miller, #8406
    1040 Main Avenue
    Durango, CO 81302
    (970) 247-1113
    Attorney for Plaintiff